IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| REMILEKUN K. DAVIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-890 |
| | § | |
| JEFFERSON B. SESSIONS, *et al.* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

In April 2014, Remilekun Davis filed a N-400 naturalization application, seeking naturalization based on his military service. Davis interviewed for naturalization in March 2015. The United States Citizen and Immigration Services determined that Davis was ineligible for naturalization because he failed to demonstrate good moral character. Davis administratively appealed the Service's decision, which was denied on March 20, 2017. Davis sued, seeking judicial review in this court.

The government moved for summary judgment on the ground that, as a matter of law, Davis cannot establish himself as a person of good moral character. (Docket Entry No. 46). Davis cross-moved for summary judgment on the same issue. (Docket Entry No. 48).

Based on a careful consideration of the motions, the responses, and the reply, the administrative record, and the applicable law, Davis's motion for summary judgment is denied and the government's motion for summary judgment is granted. The reasons are set out below.

**I.   Background**

   **A.   Factual Background**

1

Davis's history is unclear. He had changed his own accounts of his life frequently. Any history he has provided is unreliable, to say the least. Davis claims to be "stateless," because he knows neither where he was born nor where his parents were born or currently are. Davis previously filed an asylum application in January 1997. Davis was ordered to show cause and appear before an immigration judge, but he failed to do so. The court granted Davis voluntary departure. Davis failed to leave the United States voluntarily and was ordered removed. Instead, Davis moved to Missouri and got a driver's license under a different name. (Docket Entry No. 8 at 1-2).

Davis served in the U.S. Army between April 2001 and August 2004, and was involuntarily discharged under honorable conditions. (Docket Entry No. 47 at 66). The Army Discharge Review Board's record does not explain his discharge. He has applied for military naturalization four times, without success: once in 2004, twice in 2009, and once again in 2014. (Docket Entry No. 8 at 2). Davis twice used fraudulent documents to attempt to obtain citizenship. In 2003, Davis pleaded guilty to making a false statement on an application for a U.S. passport by using a fraudulent birth certificate. (Docket Entry No. 47 at 59). In 2005, he pleaded guilty to making a false claim to citizenship and a false declaration before a grand jury. (Docket Entry No. 47 at 94).

Davis meets three of the four requirements for military naturalization. He served honorably in the military during a designated period of hostility, was separated honorably from the military, and was lawfully admitted to the United States as a permanent resident after enlistment. The issue is the fourth and final requirement: whether Davis can establish himself as a person of good moral character.

In March 2015, Davis interviewed with the United States Citizen and Immigration Services

as part of his most recent naturalization application. During that interview, he made several undeniably false statements. First, Davis testified to never having used fraudulent identification documents to apply for or obtain any type of federal government benefit. In response to the question, "Have you ever used a false name or identity to apply for or obtain any type of U.S. Government benefit?" he said, under oath, "No ma'am." (Docket Entry No. 47 at 29). Davis used several false identities to obtain a fraudulent birth certificate and a state-issued driver's license. Davis also used a falsified birth certificate to apply for a U.S. passport and a false Social Security number to obtain his High School Equivalence Certificate.

Davis also stated in his interview that he did not know the circumstances surrounding his discharge from the Army Reserve, nor did he know if he had been discharged voluntarily or involuntarily. This was false. Davis had previously stated in an application to USCIS that he had been discharged from the military because he had used fraudulent documents to enlist. Davis had also received a letter from the Army Discharge Review Board stating that his discharge had been involuntary.

Finally, when asked if he knew that the birth certificate he had used to apply for a U.S. passport was fraudulent, Davis responded "no ma'am." But Davis separately admitted under oath that he had altered his two-year-old daughter's birth certificate and submitting it with his passport application as his own. Davis pleaded guilty to this fraud.

Davis does not dispute the government's claim that he gave false testimony in his naturalization interview. Davis contends that, because his false testimony was immaterial and made without subjective intent to obtain a government benefit, it does not bar his naturalization. The government argues that it is entitled to judgment as a matter of law because the statute does not

require materiality and the parties do not dispute the falsity of Davis's testimony.

### B. The Government's Motion for Summary Judgment

The government argues that Davis is ineligible to naturalize under 8 U.S.C. § 1440 because he cannot show his good moral character during the relevant period. (Docket Entry No. 46). The parties do not dispute that Davis made false statements under oath during his March 2015 naturalization interview, which the government argues bars his naturalization as a matter of law. The government contends that each false statement, standing alone, is enough to bar Davis's naturalization.

The government identifies three categories of Davis's false statements: (1) statements about his past identities used to obtain government benefits; (2) statements about the circumstances of his discharge; and (3) statements about his fraudulent passport application. The government alleges that because Davis made each false statement with the intent to obtain an immigration benefit, he is precluded from establishing good character under § 1101(f)(6).

The government also argues that the court is not limited to considering Davis's conduct during the year before his naturalization application, but "may take into consideration as a basis for such determination [of good moral character] the applicant's conduct and acts at any time prior to that period." 8 U.S.C. § 1427(e). The government points to Davis's history of multiple convictions for crimes of dishonesty as evidence of a larger pattern of false statements and misrepresentations in attempts to obtain government documents and United States' citizenship.

Davis responds that the government has failed to prove that he made the false statements "with the subjective intent to obtain an immigration benefit." (Docket Entry No. 49 at 4). Davis argues that the government has failed to show how his past crimes bear on his present moral

4

character but instead argues only that they come "dangerously close" to the definition of an aggravated felony under the Act. (*Id.* at 5). Finally, Davis argues, the government applies the wrong legal standard to assess his reformation.

### C. Davis's Motion for Summary Judgment

Davis cross-moves on the basis that the regulation the government cites to argue that any falsity, regardless of materiality, bars naturalization is invalid under *Chevron*. *See* 8 C.F.R. § 316.10(b)(2)(vi). Applying the first step in the *Chevron* framework, Davis argues that the implementing statute unambiguously requires materiality. To interpret the statute otherwise, Davis argues, would make the subjective-intent requirement meaningless. Davis argues that even if the statute is silent or ambiguous as to materiality, the regulation fails *Chevron* step two because the agency's interpretation is unreasonable. Davis argues that the Fifth Circuit held in *Gonzalez-Maldonado v. Gonzales*, 487 F.3d 975, 978 (5th Cir. 2007), that a misrepresentation must be material to bar cancellation of removal under 8 U.S.C. § 1229(b)(1), based on the same "good character" statute at issue here. To require materiality in one context but not another, Davis argues, would create an unreasonable result that Congress did not intend. Davis also points to the Supreme Court's recent decision in *Maslenjak v. United States*, 17 S. Ct. 1918 (2017), holding that liability for making a false statement under oath in any case involving naturalization requires that statement be material. 8 U.S.C. § 1015. Finally, Davis argues, none of the false statements he made during his naturalization interview was either material or made with the requisite intent.

The government responds that the Supreme Court rejected Davis's argument in *Kungys v. United States*, 485 U.S. 759 (1988), when it found that 8 U.S.C. § 1101(f)(6) viewed a person who told a lie with the subjective intent to obtain immigration benefits as a person of bad moral character,

even if the lie was immaterial. According to the government, this ends the analysis. Davis asks the court to find that § 316.10(b)(vi), a regulation implementing § 1101(f)(6), invalid under *Chevron*. The government argues that the regulation is appropriate under *Chevron*. Finally, the government argues that it has shown Davis's subjective intent to obtain immigration benefits through his false statements. He made the statements during his fourth attempt to naturalize, to improve the chances that his naturalization application would be granted—a clear immigration benefit.

## II.     The Legal Standard

A court reviews *de novo* the United States Citizenship and Immigration Services's denial of a naturalization application. 8 U.S.C. § 1421(c). "[T]he court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing *de novo* on the application." *Id.* "The district court may do so by admitting and reviewing evidence in accordance with the Federal Rules of Civil Procedure, which apply pursuant to FRCP 81(a)(3) in the absence of statutory language to the contrary." *Ngomi Kariuki v. Tarango*, 709 F.3d 495, 502 (5th Cir. 2013). "[A] 'hearing de novo' within the meaning of Section 1421(c) encompasses an FRCP 56 review on summary judgment." *Id.* at 503.

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by showing an absence of evidence to support the nonmoving party's case. *Fret v. Melton Truck Lines, Inc.*, No. 17-50031, 2017 U.S. App. LEXIS 16912, at *5–6 (5th Cir. Sept. 1, 2017) (quoting *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014) (citing *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). A fact is material if "its resolution could affect the outcome of the actions." *Aly v. City of Lake Jackson*, 605 Fed. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Parish Prison*, 663 Fed. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material

7

facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, LLC*, 642 Fed. App'x 313, 317 (5th Cir. 2016) (quoting Boudreaux, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

**III. Analysis**

"'Congress alone has the constitutional authority to prescribe rules for naturalization.' Therefore, the courts' task is to ensure 'strict compliance with the statutory conditions precedent to naturalization . . . .'" *Ngomi Kariuki v. Tarango*, 709 F.3d 495, 503–504 (5th Cir. 2013) (alteration in original) (quoting *Fedorenko v. United States*, 449 U.S. 490, 506–07 (1981)). Section 329 of the Immigration and Naturalization Act provides for naturalization through active-duty service in the United States military and waives the residency requirement for those who qualify. 8 U.S.C. § 1440(a); *see also Kariuki*, 709 F.3d at 499. Individuals seeking naturalization under § 1440 must have been separated from the military under honorable conditions. 8 U.S.C. § 1440(a); 8 C.F.R. § 329.2(b).

Section 1440 requires the applicant to show that he "has been, for at least one year prior to filing the application for naturalization, and continues to be, of good moral character . . . ." 8 C.F.R. § 329.2(d). The applicant has the burden to show his good moral character. 8 C.F.R. § 316.10(a)(1); *Kariuki*, 709 F.3d at 504. Section 1101(f) gives specific examples of conduct that precludes a finding of good moral character: "No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was– (6) one who has given false testimony for the purposes of obtaining any benefits under

8

this Act . . . ." 8 U.S.C. § 1101(f)(6).

The relevant facts are undisputed. The disagreements are over the law.

### A. Do the Statute and Regulations Include a Materiality Requirement?

The parties dispute whether § 1101(f)(6) requires materiality. Section 316.10(b)(vi) states that an applicant lacks good moral character if he has given false testimony under oath with the intent to obtain an immigration benefit, and that "this prohibition applies regardless of whether the information provided in the false testimony was material." 8 C.F.R. § 316.10(b)(vi). Davis contends that this regulation is invalid under *Chevron*. *See, e.g.*, *Luminant Generation Co. LLC v. United States EPA*, 714 F.3d 841, 850 (5th Cir. 2013) (citing *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)).

Under *Chevron* step one, the court "must determine first whether Congress has directly spoken to the question at issue." *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012) (citing *Chevron*, 467 U.S. at 842). "In performing this analysis, the court 'employ[s] traditional tools of statutory construction.'" *Luminant*, 714 F.3d at 850 (quoting *Chevron*, 467 U.S. at 843 n.9). "[A] statutory provision cannot be read in isolation, but necessarily derives its meaning from the context provided by the surrounding provisions, as well as the broader context of the statute as a whole." *Id.* (quoting *Khalid v. Holder*, 655 F.3d 363, 367 (5th Cir. 2011)). If the statute is unambiguous, the court "must give effect to the unambiguously expressed intent of Congress." *Orellana-Monson*, 685 F.3d at 517 (citing *Chevron*, 467 U.S. at 842-43).

If the statute is silent or ambiguous, the court goes to step two of the *Chevron* analysis and asks "whether the agency's answer is based on a permissible construction of the statute." *Orellana-Monson*, 685 F.3d at 520. "If Congress has explicitly left a gap for the agency to fill, there is an

express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 519 (quoting *Chevron*, 467 U.S. at 843-44). The court gives the agency's interpretations "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* (quoting *Chevron*, 467 U.S. at 844).

Davis argues that § 1101(f)(6) does not contain the word "material" and is therefore silent on the issue of materiality. Davis also argues that courts have interpreted the statute to include a materiality requirement. Both arguments fail.

In *Kungys v. United States*, 485 U.S. 759, 779–780 (1988), the Court held that § 1101(f)(6) is unambiguous and does not include a materiality requirement:

> Under 8 U.S.C. § 1101(f)(6), a person shall be deemed not to be of good moral character if he 'has given false testimony for the purpose of obtaining' immigration or naturalization benefits. On its face, § 1101(f)(6) does not distinguish between material and immaterial misrepresentations. Literally read, it denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits. We think it means precisely what it says.
>
> The absence of a materiality requirement in § 1101(f)(6) can be explained by the fact that its primary purpose is not (like § 1451(a)) to prevent false pertinent data from being introduced into the naturalization process . . . but to identify lack of good moral character. The latter appears to some degree whenever there is a subjective intent to deceive, no matter how immaterial the deception.

The *Chevron* analysis ends with the Court's holding. This court need not consider what deference is owed to the § 316.10(b)(2)(vi) under step two. *Cf. Burks v. United States*, 633 F.3d 347 (5th Cir. 2011) ("Because we hold that [the statute] is unambiguous and its meaning is controlled by the Supreme Court's decision in *Colony*, we need not determine the level of deference owed to the Regulations.").

Davis also argues that "the Fifth Circuit has already held that the same statute contains a materiality requirement," in the denaturalization context and to hold otherwise here would create two distinct meanings for the same statute. (Docket Entry No. 48 at 9). Davis relies on *Gonzalez-Maldonado v. Gonzales*, 487 F.3d 975 (5th Cir. 2007), to support his argument that § 1101(f)(6) has been unambiguously interpreted to require materiality, "because finding an immaterial misstatement to impinge good moral character would render the statute's subjective intent requirement meaningless." (Docket Entry No. 48 at 8). His argument is unpersuasive. In *Gonzalez-Maldonado*, 487 F.3d at 976, is instructive. An asylum-seeker who lived in New Mexico listed his attorney's California address as his own on his application for asylum, to ensure that his attorney would receive future court documents. By signing the application, the applicant swore to the truth of the contents. In his interview, the applicant, under oath, told the asylum officer that he had lived in California since December 2000, when he lived in New Mexico, and he confirmed that the information in his application was correct. Based on that false testimony, the applicant was denied cancellation of his removal. The Fifth Circuit held that "[a] finding that Gonzalez has given false testimony is alone insufficient to establish that he lacks good moral character." *Id.* at 977. Contrary to Davis's argument, however, the court did not base that finding on the immateriality of the statements made, but on the subjective-intent requirement:

> The statute also provides that the misrepresentation must have been "made with the subjective intent of obtaining immigration benefits. " Misrepresentations made for other reasons like embarrassment, fear, or a desire for privacy do not meet this requirement. Although *Kungys* rejected a materiality requirement because no such requirement appears in the statutory test, the Court pointedly observed that "it will be relatively rare that the Government will be able to prove that a misrepresentation that does not have the natural tendency to influence the decision regarding immigration or naturalization benefits was nonetheless made with the subjective

11

> intent of obtaining those benefits."

*Id.* (citations omitted). The court explained that:

> Gonzalez's misrepresentation is immaterial because his address had no bearing on his receipt of immigration benefits. We understand that § 1101(f)(6) "denominates a person to be of bad moral character on account of having given false testimony if he was told even the most immaterial of lies with the subjective intent of receiving immigration or naturalization benefits." Nevertheless, the Government has a more difficult burden to show that Gonzalez made an immaterial misrepresentation with such intent. The record concerning his misstated address demonstrates, if anything, that Gonzalez lacked the subjective intent to use the false testimony improperly.

*Id.* at 978. The court held that Gonzalez's false testimony did not bar cancellation of removal because he lacked the required subjective intent, not because his statement was immaterial. Davis focuses on a single line from the case, that "if Gonzalez's immaterial misstatement about his residency in California runs afoul of § 1101(f)(6), the subjective-intent requirement explained in *Kungys* becomes superfluous." *Id.* at 978–79. This does not impose a materiality requirement, as Davis suggests, but merely emphasized that falsity alone is insufficient. Subjective intent is also required. It may be more difficult to show when false testimony is immaterial, but so long as the statement is both false and made with the subjective intent to obtain an immigration benefit, it precludes a finding of good moral character under § 1101(f)(6).

The court finds that *Kungys* controls the inquiry here and explicitly holds that § 1101(f)(6) contains no materiality requirement.

### B. What Conduct May the Court Consider in Reviewing Davis's Denial of Naturalization?

The parties dispute what conduct that the court can properly consider in reviewing the denial of Davis's naturalization. Davis argues that only false statements within the one-year statutory

period under 8 C.F.R. § 329.2(d) can affect his naturalization application. (Docket Entry No. 48 at 11). The government argues that the court is not limited to reviewing Davis's conduct in the year before his naturalization application, but instead may consider conduct or acts before that period. 8 U.S.C. § 1427(e).

The Fifth Circuit in *Kariuki* explained that:

> [w]hile Section 329.2(d) sets a one-year good moral character time limit, an additional regulation explains that a reviewing tribunal "is not limited to reviewing the applicant's conduct during the [one year] immediately preceding the filing of the application." Rather, the tribunal "may take into consideration, as a basis for its determination, the applicant's conduct and acts at any time prior to that period" (i) "if the conduct of the applicant during the statutory period does not reflect that there has been reform of character from an earlier period"; or (ii) "if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character."

709 F.3d at 504 (citing 8 C.F.R. § 316.10(a)(2)). The Fifth Circuit held that because the applicant has the burden to show eligibility for naturalization, the district court may consider relevant prior conduct in evaluating the applicant's conduct and moral character. *Id.* at 504–05.

The government argues that Davis's prior conduct—his prior convictions for crimes of dishonesty in using or obtaining citizenship documents—are relevant because they "come exceptionally close to triggering" the permanent bar to naturalization for those convicted of aggravated felonies. This argument is unpersuasive. Davis's convictions were not aggravated felonies. That they may "come exceptionally close" to the definition of aggravated felonies is irrelevant.

The government also argues that Davis's prior convictions show a pattern of false statements or misrepresentations in attempts to obtain citizenship, indicative of his failure to reform his bad moral character. The evidence of Davis's prior convictions for crimes of dishonesty are relevant to

13

showing that his present moral character has not changed. *See, e.g.*, *Kariuki*, 709 F.3d at 505 (a past conviction for fraudulent statements of citizenship was relevant to determining present moral character). Davis may rebut the past-conduct evidence "with sufficiently probative evidence of good present conduct . . . ." *Id.* Davis argues that the government applies an incorrect legal standard to assess his reformation, citing the USCIS Policy Manual. (Docket Entry No. 49 at 5). Davis's argument is again not persuasive. Even assuming that the USCIS Policy Manual sets a binding legal standard, the portion Davis cites states that:

> USCIS is not limited to reviewing the applicant's conduct only during the applicable [good moral character] period. An applicant's conduct prior to the [good moral character] period may affect the applicant's ability to establish [good moral conduct] if the applicant's present conduct does not reflect a reformation of character or the earlier conduct is relevant to the applicant's present moral character.
>
> In general, an officer must consider the totality of the circumstances and weigh all factors, favorable and unfavorable, when considering reformation of character in conjunction with [good moral character] within the relevant period. The following factors *may* be relevant in assessing an applicant's current moral character and reformation of character . . . .

USCIS POLICY MANUAL, VOL. 12, PART F, GOOD MORAL CHARACTER, CH. 2(B) (emphasis added). The factors Davis points to, and criticizes the government for not considering, are permissive, not mandatory. The government did not apply an erroneous legal standard in evaluating his reformation.

Davis also disputes the government's evaluation of the impact of his community involvement, arguing that there is "something uniquely redemptive about [his] chosen form of service to the community," a factor the government did not give sufficient weight to in its assessment. (Docket Entry No. 49 at 6). Davis argues that his charity work with the homeless shows his reformed character and redeems his prior convictions for fraud and dishonesty. Davis

14

argues that the government's assessment of his community involvement "distort[s] the guidance in the agency's own policy manual." (*Id.* at 5). Davis cites only the USCIS Policy Manual's list of relevant, permissive factors. The agency's policy requires its officers to "consider the totality of the circumstances and weigh all factors, favorable and unfavorable," but does not specify the weight to give any particular factor. POLICY MANUAL, VOL. 12, PART F, CH. 2(B). Davis does not argue that the government failed to consider his community service. Instead, he disputes the government's conclusion about the impact of that service. The government complied with the agency's policy in considering the totality of the Davis's circumstances.

Davis's prior convictions for crimes of dishonesty, especially as they relate to his attempts to obtain U.S. citizenship, are sufficiently relevant to his present moral character and a pattern of deception and misrepresentation to show a failure to reform his prior poor moral character.

### C. Has Davis Shown Good Moral Character Necessary for Naturalization?

The parties agree that Davis made several false statements in his March 2015 naturalization interview. The issue is whether he made those statements with the subjective intent to obtain an immigration benefit.

Davis made a false statement about his past use of a false name or identity to obtain government benefits, when he denied that he had done so and stated that he had only ever used his own name for a driver's license. (Docket Entry No. 47 at 29). Davis had, in fact, used a false birth certificate with the name Dennie Gerald Washington, Jr. to obtain a Missouri driver's license. (*Id.*). Davis also used a false Social Security number to obtain his GED from the Missouri Department of Education. (Docket Entry No. 47 at 116). Records from the Missouri Department of Education show that Davis contacted the Department to "update" his Social Security number on September 8,

15

2017, which the government contends is another example of "today's lies hiding yesterday's fraud." (Docket Entry 47 at 119). Davis was also convicted in 2003 for altering his daughter's birth certificate and using that document to apply for U.S. passport for himself. (Docket Entry No. 47 at 59). Davis admitted to using a false birth certificate in his affidavit from March 2014, stating that, "I filed for a passport application in Missouri but it was returned to me. At that point I was worried I wouldn't have time to mail another application so I made another huge mistake in my life. I proceeded to apply for a passport at the Chicago office which would give me a passport quickly but instead of using my own birth certificate I used a fraudulent birth certificate." (Docket Entry No. 47 at 66–67). These facts, the government argues, make Davis's denial that he had used a false identity to obtain government benefits demonstrably false.

Davis also made false statements about his discharge from the military. The interviewer asked Davis about the circumstances of his discharge. Davis answered that he was honorably discharged but did not know the circumstances and "was not informed prior to receiving the discharge letter." (Docket Entry No. 47 at 30). The government points to evidence Davis did know the circumstances of his discharge, making the testimony he gave in his interview false. An application to USCIS in October 2008 asked: "Why did you get out of the military?" Davis's answer was: "I was discharged because the docs I used to enlist were fraudulent." (Docket Entry No. 47 at 57). This statement, the government argues, shows that even if Davis did not know the circumstances when he was discharged, he knew about them by 2008, nearly seven years before his naturalization interview. The application also asked whether his discharge from the military was voluntary or involuntary. He answered that he was not sure he knew the difference between the two. That is false. The government points to a letter that Davis received in March 2012 in response to

16

his appeal to the Army Discharge Review Board. The letter states that "Chapters 2 and 3 of [Army Regulation 135-175] provide the basis for involuntary separation of [Army Reserve] officers." (Docket Entry No. 47 at 52). This statement, the government argues, demonstrates that Davis had notice that he was involuntarily discharged and why, making his response false.

Finally, Davis made a false statement when he denied knowing that the birth certificate he used to apply for his first U.S. passport was fraudulent. The government points to Davis's 2003 conviction and his statements admitting he used his daughter's birth certificate to apply for his own U.S. passport. (Docket Entry No. 47 at 66–67).

Davis does not deny the falsity of these statements. Instead, he argues that the statements were immaterial or made without subjective intent to obtain an immigration benefit. As discussed above, the materiality of a false statement under § 1101(f)(6) is irrelevant.

Davis also argues that because he previously stated under oath that he had used multiple names in the past, his denial that he had used a false identity to obtain a government benefit was not made with any subjective intent to obtain naturalization. Davis similarly argues that the statements he made about his discharge from the military do not demonstrate subjective intent. Davis contends that "[a]n applicant with a graduate level education and legal savvy coupled with the subjective intent to lie to get citizenship, especially one who had been denied citizenship on multiple occasion for substantially similar reasons, would have done better to give in to the Service's persistent suspicions and general disbelief of his story." (Docket Entry No. 48 at 16). Essentially, Davis argues that he is smart enough to lie better, if that's what he intended to do.

The government responds that the evidence it has presented shows that Davis purposely obscured the truth to "gloss[] over the negative aspects of his military service," to improve his

17

chances of naturalizing. (Docket Entry No. 53 at 2). The government notes that this is Davis's fourth attempt to obtain citizenship. *See, e.g.*, *Ibrahim v. Dep't of Homeland Sec.*, 205 Fed. App'x 289, 291 (5th Cir. 2006) (per curiam) (affirming the district court's finding that the plaintiff was not a person of good moral character based on several instances of false testimony given in an attempt to obtain naturalization). The government also argues that because it has presented evidence that Davis provided false testimony in his interview, the summary judgment burden has shifted to Davis, who cannot simply rely on his pleadings or assertions that his lies were told innocently and without the requisite intent. Davis has not provided or pointed to evidence of alternative reasons or explanations for the false statements he made.

The record shows that Davis has a lengthy history of misrepresentation and deception in his attempts to obtain U.S. citizenship. Davis has used a number of different names and identities over the years, including to apply for a Social Security card, to obtain driver's licenses in more than one state, to enlist in the U.S. Army Reserve, and to apply for a U.S. passport three different times. (Docket Entry No. 47 at 8). Davis has at times represented himself to be a U.S. citizen, born in the Virgin Islands, (Docket Entry No. 47 at 3), and at other times an asylum-seeker born in Nigeria, whose life was in danger for "covert spying on an anti-government militia group that was killing people who opposed their ideology," (Docket Entry No. 47 at 8–9). Davis had already been ordered deported twice before his 2015 denial of naturalization, (Docket Entry No. 47 at 5), failed to comply with a voluntary departure order by absconding, relocating, and creating a new identity, (Docket Entry No. 47 at 6), and was finally removed in September 2017, (Docket Entry No. 37). Davis has been criminally convicted of making a false statement in the application and use of a U.S. passport, (Docket Entry No. 47 at 59), making a false claim to U.S. citizenship, and making a false statement

18

under oath to a grand jury, (Docket Entry No. 67). Davis admitted that he had been discharged from the U.S. military because he had used fraudulent documents to enlist. (Docket Entry No. 47 at 57). The court finds that Davis's history of deception and his repeated attempts to gain U.S. citizenship or government benefits through false statements amply demonstrate that he made the false statements during his March 2015 interview to improve his chances of naturalizing. The evidence clearly shows he had subjective intent to obtain an immigration benefit. Davis offers no evidence other than his self-serving assertions and conclusory statements to show any other reason for the false testimony he gave under oath. *See, e.g.*, *Islam v. Harrington*, 2001 U.S. Dist LEXIS 17330, at *18–19 (N.D. Tex. Oct. 23, 2001) (finding that signing a form under penalty of perjury without "mitigating or explanatory evidence" for the misrepresentations made constituted subjective intent to deceive immigration officers and obtain immigration benefits); *see also Gonzalez-Maldonado*, 487 F.3d at 975 (finding no subjective intent where the applicant provided an explanation for listing his attorney's address as his own with the subjective intent to "facilitate the immigration process"). Considering Davis's prior conduct, his false testimony during his naturalization interview "does not reflect that there has been reform of character from an earlier period." The evidence of community service that Davis presents to rebut his prior conduct does not outweigh or undo years of repeated deception and misrepresentation to gain citizenship.

The undisputed facts show that Davis gave false testimony with the subjective intent to obtain the immigration benefit of naturalization in violation of § 1101(f)(6). Because Davis cannot, as a matter of law, establish his good moral character, the Service's denial of his application for naturalization was correct.

**IV.     Conclusion**

Davis's motion for summary judgment, (Docket Entry No. 48), is denied. The government's motion for summary judgment is granted. (Docket Entry No. 46), is granted.

SIGNED on February 22, 2018, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge